**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
ANTHONY J. CEPARANO,

                              *Pro Se* Plaintiff,

                                                                    **REPORT AND**
              - against -                                           **RECOMMENDATION**

SUFFOLK CO. DEPT OF HEALTH,                                         CV 09-558 (SJF) (AKT)
S.C.C.F. MEDICAL UNIT, DEPT OF HEALTH
COMM. HUMAYUN CHAUNDRY, S.C.C.F.
CHIEF ADM VINCENT GERACI, DOCTOR
"IGOR", DR. PRENTISS, NURSE PRACTIONER
ALICE, NURSE PRACTIONER "JANE DOE",
DRUG/ALCOHOL COUNSELOR ELIANA and
NURSE "JAMES DOE" LPN,

                              Defendants.
-------------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.      PRELIMINARY STATEMENT**

          Plaintiff Anthony J. Ceparano ("Ceparano" or "Plaintiff"), proceeding *pro se*,[1] brings this

action against Suffolk County Department of Health, Suffolk County Correctional Facility

Medical Unit, Suffolk County Department of Health Commissioner Humayun Chaundry, Suffolk

County Correctional Facility Chief ADM Vincent Geraci, Doctor "Igor," Dr. Prentiss, Nurse

Practioner Alice, Nurse Practioner "Jane Doe," Drug/Alcohol Counselor Eliana and Nurse

"James Doe" LPN (collectively, "Defendants"), alleging violations of his constitutional rights

pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments.  This action arises out

of Plaintiff's incarceration at Suffolk County Correctional Facility during which, Plaintiff

---

[1]       On December 20, 2009, Attorney Arthur Graseck filed a Notice of Appearance of
Ceparano's behalf.  *See* DE 60.  However, Ceparano filed the pending motions prior to obtaining
counsel and so, for purposes of this decision, is considered to be proceeding *pro se*.

alleges, he received inadequate medical treatment for various conditions, including herniated discs, injuries incurred during a car accident, post-traumatic stress disorder, potentially cancerous skin growths, and prior drug addiction. Plaintiff seeks an award of $135,000,000.00 in "punitive and compensatory damages for intentional and negligent infliction of permanent pain and suffering, of both physical and emotional dimensions." Compl. [DE 1] at 51.[2] Plaintiff also seeks injunctive relief in the form of orders requiring (1) the Suffolk County Correctional Facility to allow him access to medical treatment for his various conditions; (2) the "immediate termination of all personnel guilty of perpetrating a fraudulent illusion of medical care to [Plaintiff], and others[;]" and (3) criminal charges for corresponding violations of applicable penal, health and correctional law." *Id.* at 51-55.

To date, Defendants Suffolk County Department of Health, Commissioner Chaundry, Dr. Geraci and Dr. Prentiss have been served with copies of the Summons and Complaint. *See* DE 16, 19, 21, 22. The Suffolk County Correctional Facility Warden and the Suffolk County Attorney were also served. *See* DE 24, 25. The Suffolk County Attorney's Office filed an Answer on behalf of Defendants Chaundry, Geraci and Prentiss, denying "the operative allegations of wrongdoing set forth in the . . . Complaint . . . including but not limited to those set forth in the paragraphs numbered "IV" of the Complaint." *See* DE 15 at 1. Defendants Chaundry, Geraci and Prentiss also asserted 16 affirmative defenses and demanded "judgment against the plaintiff dismissing the Complaint, together with the costs and disbursements of this

---

[2]    Specifically, Plaintiff seeks $100,000,000 for a "degenerative disc disease/spinal surgery condition [which was] ignored completely [for] 3 years plus;" $25,000,000 for a "knee injury [which was] ignored [for] 1 year plus;" $5,000,000.00 for a "skin growth/possible cancer;" and $5,000,000 for "all other conditions[,]" for a total of $135,000,000.00. Compl. at 55.

action. . . ." *Id.* at 1-5.  The remainder of the Defendants have not been served and have not appeared in this action.

Presently before the Court are the following motions:  (1) Plaintiff's Motion to Compel [DE 12] requesting that the Court issue certain orders regarding, among other things, Plaintiff's access to the prison law library; (2) Plaintiff's Motion for Entry of Default Judgment [DE 27]; (3) Plaintiff's Motion for Judgment on the Pleadings [DE 44]; and (4) Plaintiff's Motion to Amend the Complaint [DE 53].

All of these motions have been referred to me by Judge Feuerstein for a Report and Recommendation.  Based upon the documentary evidence, the parties' written submissions and the applicable case law, and for the reasons set forth below, I respectfully recommend to Judge Feuerstein that (1) Plaintiff's Motion to Compel be denied; (2) Plaintiff's Motion for Entry of Default Judgment be denied; (3) Plaintiff's Motion for Judgment on the Pleadings be denied; and (4) Plaintiff's Motion to Amend the Complaint be denied.

## II.   BACKGROUND

### A.   Factual Context

The following information is taken from Plaintiff's Complaint ("Compl.") [DE 1] and does not constitute findings of fact by the Court.  The events at issue in the Complaint occurred during Ceparano's incarceration at Suffolk County Correctional Facility ("SCCF") beginning on September 17, 2007.[3]  Ceparano alleges that while at SCCF he did not receive adequate medical

---

[3]     Ceparano was also incarcerated at SCCF from February 2 - May 25, 2006 (Compl. at 14), but refers to that period only as background -- for example, he alleges that during both the initial incarceration period and the later period, SCCF did "nothing to treat [his] condition, or facilitate any attempt to alleviate it, much less fix it."  Compl. at 27-28.  Thus the Court construes Plaintiff's claims as primarily arising from the later incarceration period.  Ceparano is no longer incarcerated at SCCF, as he was transferred to a different facility in and around October 2009

care for several conditions, including (1) a pre-existing back condition; (2) weight gain problems; (3) knee damage and other injuries resulting from a car accident in June 2007; (4) post-traumatic stress disorder following that accident; (5) potentially cancerous skin growth; and (6) a drug addiction history. Ceparano maintains that the lack of medical care at SCCF and the poor quality of the care he did receive constitute violations of his Eighth and Fourteenth Amendment rights.

### 1. *Injuries Resulting From Car Accident*

On June 5, 2007, Ceparano was involved in a car accident, following which the other driver died. Compl. at 3, 42. As a result of the accident, Ceparano's right femur bone "was driven up into the hip socket, tearing ligaments, and breaking [his] pelvis (hip bone). Then the femur shattered - snapped in 3 places, leaving a two-inch gap in the bone, and fragments everywhere. The pain was excruciating." *Id*. at 31. Following the accident, Ceparano was taken to the emergency room, where he was apparently in a "drug induced coma" for two days, and where he underwent surgery to repair his leg. *Id*. at 31-33. After approximately two weeks in the hospital, Ceparano was transferred to SCCF. He was housed in the medical unit and was bedridden for most of the time prior to his arraignment on September 17, 2007 in New York State Supreme Court, Suffolk County, for charges related to the car accident. *Id*. at 33. Following the arraignment, Ceparano remained in the medical unit at SCCF and claims he was not permitted to see the doctors who treated him at the hospital for follow-up appointments. *Id*. at 34.

_____

(*see* DE 59), after filing the motions at issue here.

## 2.    *Plaintiff's Back Condition*

At the time Ceparano entered SCCF in September 2007, he also suffered from a long-term degenerative disc disease (which he alternately refers to as herniated discs), for which he had been under the care of doctors since at least 1997, and for which he intended to have various back operations.[4]  *Id*. at 13-17.  According to Ceparano, his back conditions were exacerbated by the June 2007 car accident and he needs to have certain operations, including a lumbar fusion surgery, immediately -- otherwise, he will be permanently injured and confined to a wheelchair. *Id*. at 17-18.

Upon entering SCCF in September, Ceparano was examined by Defendant Nurse Practitioner "Alice," who refused to obtain his medical files from his personal orthopedist and declined his requests for back surgery on the grounds that such surgery was "elective" and that the condition could instead be treated "conservatively with exercise."  *Id.* at 18-19.  Nurse Practitioner Alice also declined Ceparano's request to see a doctor due to, among other things, "security concerns" (*id*. at 6), and refused to prescribe a certain type pain killer on the grounds that Ceparano previously had a drug addiction.  *Id*. at 23.  Instead, the Nurse Practitioner prescribed an anti-inflammatory, Flexeril.  *Id*. at 21.  During this visit, Nurse Practioner Alice also informed Ceparano that he would not be permitted to see the doctors who treated him at the hospital following the car accident and that all necessary treatment "would be done by the jail in the jail."  *Id*. at 34.  Following conversations between SCCF medical personnel and the doctors who treated Ceparano at the hospital, Ceparano was given a cane and told he should walk on his

---

[4]    Ceparano asserts that he needs three types of back surgery, two of which he states as (1) fusion surgery on lumbar discs L4-S1 (lower back), and (2) fusion surgery on cervical discs C5 - C7 (neck).  *See* DE 34 at 4.

leg "to stimulate bone growth." *Id*. at 35. However, according to Ceparano, such walking was not possible because he was housed in the medical tier, "which is 21 hour lockdown." *Id*. Ceparano also maintains that he was supposed to have an x-ray taken on September 26, 2007, but such x-ray was not taken until late October and he was not informed of the results. *Id*.

Following his initial examination by Nurse Practioner Alice, Ceparano requested a second mattress because the "standard issue state mattress, worn from years of use, allowed [his] hips and shoulders to press right through to the metal slab in the bed frame causing [him] pain, and preventing [him] from ever sleeping more than an hour straight. . . ." *Id*. at 22. Ceparano was informed that his request was refused pursuant to SCCF policy -- "by Order of the Warden, no one was allowed two mattresses because it causes jealousy and fights." *Id*. Ceparano also requested two extra blankets, one to use as a pillow "to keep [his] neck properly supported," and the other for warmth because the cold adversely affects his back conditions. *Id*. Subsequently, Nurse Practioner Alice authorized Ceparano to receive an extra blanket (*id*. at 25), and provided him with a list of back exercises to treat his back conditions (*id*. at 6).

As of November 2007, Ceparano asserts that his knee had not healed following the car accident, he was still in extreme pain, and he believed he had two torn ligaments. *Id*. at 3, 36. Ceparano requested an x-ray of his knee and leg, which he received within approximately one month of the request. *Id*. at 37. However, he was not permitted to see the report following the x-ray. *Id*. at 3, 37. Ceparano states that he filed a grievance demanding an evaluation by an orthopedist, but was never seen by such doctor. *Id*. at 3.

Shortly thereafter, Ceparano returned to the SCCF medical facility and was examined by Defendant Dr. "Igor" regarding both his back and knee conditions. *Id*. at 24, 37. Regarding the

knee issue, Dr. Igor stated that Ceparano had bone spurs and arthritis, a diagnosis which Ceparano "adamant[ly]" disputes. *Id*. at 37. Regarding Plaintiff's back condition, Dr. Igor informed Ceparano that he could not have the requested back operation while at SCCF, but rather, would "have to wait until [he] got out, or go upstate." *Id*. at 24. Dr. Igor also prescribed the pain killer Vicodin, one 500 mg pill at night for one week, but would not prescribe the requested sleep medication Soma. *Id*. at 24, 38. Plaintiff claims the amount of Vicodin was insufficient, as prior to his incarceration he took six 1,000 mg pills per day and three pills of Soma. *Id*. at 24.

One week later, Ceparano returned to the medical facility and was seen by Nurse Practioner Alice, who discontinued the Vicodin treatment and again refused Ceparano's demands for evaluation by his previous doctors and surgery for his back and knee. *Id*. at 24-25, 38.

According to Ceparano, he was not given any "meaningful examination," and Nurse Practioner Alice denied that his condition existed. *Id*. at 39. Nurse Practioner Alice also took an x-ray, which Ceparano asserts was inadequate because she refused to perform "any further diagnostic testing." *Id.*

### 3.    *The Annual Physical Exam*

On September 9, 2008, Ceparano was given an annual physical examination by Defendant Dr. Prentiss, who tested Ceparano's blood pressure and listened to his heart and lungs. *Id.* at 7, 39. Ceparano notes, however, that Dr. Prentiss did not do any "testing/expenditure such as lab work-up of [his] blood[ [which is] standard in <u>any</u> adult physical." *Id*. at 7. During the exam, Ceparano told Dr. Prentiss about his "problems with [his] back and knee, and [his] futile request for treatment[,]" as well as his eyesight trouble and "a sizeable skin growth [which

7

Ceparano] was worried may be cancerous." *Id*. According to Ceparano, Dr. Prentiss said he would put him down for an eye exam, and then said the following: "Let me ask you this. Why should I, a taxpayer, pay for your medical treatment, when you're here for committing a crime, and will leave soon, and can pay for it yourself." *Id*. Dr. Prentiss also told Ceparano that, with regard to his back condition, they would "[s]ee in a couple of months. Let's see what happens." *Id*. at 8. Ceparano states that following his appointment with Dr. Prentiss, he was not called back to the medical center for the eye exam or an examination of the skin growth. *Id*.

### 4. *Weight Gain*

Ceparano alleges that after six months at SCCF, he had gained approximately 25 pounds, which put extra pressure on his back, causing "excruciating pain" and exacerbating his back condition. *Id*. at 3, 25. Ceparano further maintains that such weight gain "produces immediate radicul[o]pathy (nerve pressure pain) in both legs, and makes it impossible for [him] to function." *Id*. at 3. On March 25, 2008, after Ceparano had submitted several requests for daily weight checks, Nurse Practioner Alice authorized weight checks approximately "every 2 to 3 weeks" and Ceparano had his first weight check on May 31, 2008. *Id*. at 4, 25-26. Ceparano was weighed on a weekly basis during the next six weeks -- between June and mid-July 2008 -- during which he lost 17.5 pounds. *Id*. at 4, 26. The weight checks then stopped because he had reached "within 5 [pounds] of [his] entry weight," and so the regular weight checks were deemed "no longer medically indicated." *Id*. at 27.

Ceparano asserts that during the second weight check, Defendant "Nurse Jane Doe" LPN "angrily scream[ed]" at him and told him to "stop dropping slips[,]" as weight checks were done "on Saturdays at 8AM, that's it." *Id.* at 26.

### 5.    *Post-Traumatic Stress Disorder*

During the week prior to the accident, Ceparano learned that his girlfriend had been raped while he was incarcerated in 2006.  Ceparano asserts that the combination of learning this information, his involvement in the June 2007 car accident -- as a result of which an elderly woman died, and being "wrongly accused of manslaughter," has caused him to suffer post-traumatic stress disorder ("PTSD").  *Id*. at 42-43, 45.  Despite submitting requests, Ceparano states that he was not permitted to meet with an SCCF psychiatrist.  *Id*. at 43-44, 45.  Eventually, Ceparano received anti-anxiety medicine that helped him to sleep, but he takes issue with the fact that "this medication is essentially all the mental health treatment [he] receive[s]."  *Id*. at 43-44.  Ceparano adds that the "five to ten minute visits" to the mental health nurse "primarily consist of renewal of, and monitoring the medication."  *Id*. at 44.  Ceparano further objects to the way the medicine is administered because, for security purposes, "all pills are crushed, and all capsules opened and poured in your hand[,]" which, he asserts made him ill and forced him to discontinue taking such medicine.  *Id*. at 44-45.

### 6.    *Potentially Cancerous Skin Growths*

Between September 2007 and September 2008, Ceparano noticed three "skin tabs" on his body, which he feared were cancerous.  *Id*. at 46-47.  Beginning in approximately October 2008, he submitted three or four slips requesting a biopsy, all of which were ignored.  *Id*. at 47

### 7.    *Treatment for Previous Drug Addiction*

Ceparano takes issue with SCCF's lack of "professional" treatment programs for drug and alcohol addiction.  *Id*. at 49.  He also objects to the limited access prisoners have to Narcotics Anonymous and Alcoholics Anonymous programs, for which they must sign up,

become listed as a member, and then be called by a Corrections Officer.  *Id*.  According to Ceparano, he signed up for both programs but was not called to go and received hostile responses to his inquiries regarding the same.  *Id*.

At some point, Ceparano found an Alcoholics Anonymous "Basic Text," which he read, but to which he found it difficult to relate because he had been addicted to narcotics, not alcohol.  *Id*. at 50.  In late 2008, while at the SCCF medical center, Ceparano asked Defendant Drug/ Alcohol Counselor "Eliana" to get him a Narcotics Anonymous "Basic Text" so he could "have more self-treatment, in lieu of the meetings."  *Id*.  Eliana refused to discuss the issue with him, according to Ceparano, insisting that he submit a slip.  *Id*.   One week later, Ceparano was given an appointment with Eliana, who informed him that SCCF "did not provide <u>any</u> material for A/A and N/A meetings, and that you had to get a family member to provide them."  *Id*. (emphasis in original).  Eliana told Ceparano that she could not do anything about his request and that she would place him back on the list.  However, over the next 16 months, Ceparano states that he was never called for a meeting.  *Id*. at 51.

### 8.    *Additional Medical Issues*

Ceparano alleges that SCCF has provided inadequate medical treatment in connection with several other medical conditions, including:  eyesight problems (he says his requests for an eye exam were ignored) (*id*. at 46); a gum infection which he developed in May 2008 and which took weeks to heal rather than days because of SCCF's refusal to provide him with salt (*id*. at 48); and an ear ache as a result of which Ceparano believes he suffered hearing loss, but for which he did not seek treatment because he believed he would be ignored (*id*.).

### 9.      *ADA Claims*

In the Motion for Judgment on the Pleadings [DE 34],[5] Ceparano alleges that he is "permanently disabled" and, under the Americans With Disabilities Act ("ADA"), SCCF is obligated to accommodate his disabilities beyond the requirements of the Eighth Amendment. *See* Pl.'s Mem. at 3-4.  According to Ceparano, "[t]he sole acts which could be characterized" as complying with the ADA are (1) giving him an extra blanket, "which [he] fashion[ed into] a pillow" for additional neck support, and (2) allowing him to use a scale "to monitor his weight, for <u>six weeks</u> of the 86 weeks incarceration to date."  *Id*. (emphasis in original).

### 10.      *Plaintiff's Retaliation Claims*

Ceparano maintains that another inmate at SCCF informed him that "the jail retaliates for filing regular grievances."  *Id.* at 8.  He also contends that the following retaliatory actions were taken against him.  First, in retaliation for Ceparano's multiple requests during the initial examination, including asking to see a doctor and to receive a prescription for Vicodin, Nurse Practitioner Alice "never wrote the 'extra blanket' order."  *Id*. at 23.  Second, in retaliation for his repeated requests to transfer out of the medical tier, Ceparano was moved "to a gang tier full of 'Bloods[,]'" where there was a riot within 24 hours of his arrival; he was then locked down 23 hours a day.  *Id*. at 35-36.  Ceparano asserts that SCCF risked his life and his health by "transferring a crippled, nearly 40 year old, white man to a tier with young, black gang members, on the even of a war between 'Bloods' and Non-'Bloods.'"  *Id*. at 36.  Third, Ceparano claims

---

[5]      In light of the Second Circuit's "mandate to read the papers of *pro se* litigants generously," it is appropriate to consider Plaintiff's motion papers here as effectively amending the allegations in the Complaint, to the extent that those factual assertions are consistent with the Complaint.  *See Parks v. Smith*, 9:08-CV-0586, 2009 WL 3055279, at *4 and n.8 (N.D.N.Y. Aug. 17, 2009) (citing cases).

that as of September 7, 2008, the SCCF medical unit no longer answered his slips, "despite knowledge that denial of access to treatment could cause me permanent nerve damage and paralysis." *Id*. at 29, 41.

## B. Plaintiff's Medical Grievances

Ceparano maintains that he filed two "medical grievances" at SCCF in connection with the claims set forth in the Complaint.[6] First, he filed a medical grievance regarding his knee condition -- when he was not allowed to see the x-ray report and was told he had arthritis and bone spurs, he "filed a grievance demanding an evaluation by an <u>orthopedist</u>. . . ." *Id*. at 3. Subsequently, Ceparano was examined by Nurse Practitioner "Jane Doe" (whom he describes as "possibly Pat or Reema"), who asked him to extend his legs and compared both, performing a visual inspection, and then "pressed [his] knee with both thumbs, causing pain." *Id*. at 4. The Nurse then "re-read the x-ray report, and repeated what [Ceparano] was already told, 'You have arthritis and bone spurs,' then added 'it's not hot. It's not cold. You are fine.'" *Id*. Ceparano responded that he "was not fine, that it always hurt, and listed a host of deficiencies." He further "demanded an MRI[,]" but was refused on the grounds that "it was 'not medically indicated.'" *Id*. at 5.

Ceparano also filed a medical grievance related to the herniated discs in his back. After receiving weekly weight checks for six weeks -- during which he lost approximately 15 pounds -- the checks "abruptly stopped[,] and so he "filed a grievance demanding they be re-started." *Id*. at 4. In response, Nurse Practitioner "Jane Doe" informed Ceparano was told that he would no

---

[6] In Section II of the form Complaint, Ceparano noted that the SCCF "Medical Dept has a separate 'medical grievance procedure' apart from the standard grievance procedure." Compl. at 2.

longer receive the weight checks because he was within five pounds of his entry weight, had already received an extra blanket, had seen a dietician and had weight checks for six weeks. *Id.* at 5. The Nurse discussed eating healthy and stated that further weight checks were "not medically indicated." *Id.*

With regard to filing a medical grievance in connection with his demand for back surgery, Ceparano states he did not do so because he believed it would be useless. *Id.* at 5-6. Specifically, Ceparano alleges that he was discouraged from filing a third grievance by "the fact that a <u>nurse</u> presided over" the two examinations following his submission of medical grievances "while a corrections officer hovered over us in the doorway while [the nurse] systematically dismissed my claims and denied me access to any diagnostic testing, or evaluation by a doctor much less a specialist. . . ." *Id.* at 6 (emphasis in original).

III. **STANDARD OF REVIEW**

Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c), on the grounds that Defendant's Answer is "wholly inappropriate," an attempt to "overwhelm" Plaintiff and convince him to abandon his claims, and demonstrates that Defendants "<u>have no defense</u> to the allegations in Plaintiff's Complaint." Pl.'s Mem. [DE 34] at 1-2 (emphasis in original).

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (citing *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)). In reviewing a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the

plaintiff.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  The plaintiff must

satisfy "a flexible 'plausibility standard.'"  *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007),

*rev'd on other grounds sub nom. Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 173 L. Ed. 2d

868 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set

of facts consistent with the allegations in the complaint."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 563, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  The Court, therefore, does not require

"heightened fact pleading of specifics, but only enough facts to state a claim to relief that is

plausible on its face."  *Id.* at 570.

       The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v.*

*Iqbal*, __ U.S. __, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), setting forth a two-pronged

approach for courts to utilize in deciding a motion to dismiss.  District courts are to first

"identify[] pleadings that, because they are no more than conclusions, are not entitled to the

assumption of truth."  129 S. Ct. at 1950.  Though "legal conclusions can provide the framework

of a complaint, they must be supported by factual allegations."  *Id.*  Second, if a complaint

contains "well-pleaded factual allegations, a court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief."  *Id.*  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully."  *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556-57) (internal

citations omitted).

Generally, a motion for judgment on the pleadings is granted only where the facts are uncontroverted and can be disposed of on the basis of the pleadings. *See Heath v. Caparra*, 93 Civ. 1361, 1998 WL 35129, at *1 (S.D.N.Y. Jan. 30, 1998). Similar to a motion for summary judgment, "[t]he role of the court is not to resolve disputed facts, but rather to determine whether the records as a whole supports any issues that require a trial." *Id.* (citation omitted).

In addition, the Court is mindful that Plaintiff is proceeding *pro* se, and the pleadings therefore must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.*, 07 Civ. 1801, 2009 U.S. Dist. LEXIS 54141, at *13-14 (S.D.N.Y. Jun. 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The pleadings are interpreted to raise the strongest arguments they suggest. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Weixel v. Bd. of Educ. of the City of New* York, 287 F.3d 138, 145-46 (2d Cir. 2002). However, "[a] complaint containing only conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 183, 175 (2d Cir. 1983).

IV.   **DISCUSSION**

In this Section 1983 action, Ceparano alleges that Defendants failed to provide him with adequate medical care at SCCF, thereby subjecting him to cruel and unusual punishment in violation of his Eighth and Fourteenth Amendment rights.[7] Ceparano contends that, among other

---

[7]      At the time of the events alleged in the Complaint, Ceparano was a pre-trial detainee. Because Eighth Amendment claims are available only to plaintiffs who have been convicted of a crime, Ceparano's claims are construed as arising under the Fourteenth Amendment. *Hill v. Nieves*, No. 06 Civ. 8213, 2008 WL 858455, at *5 (S.D.N.Y. Mar. 31, 2008) (citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)). The standard for evaluating medical treatment claims is the same under the Eighth and Fourteenth Amendments. *Cuoco v. Moritsugu*, 222 F.3d 99 106 (2d Cir. 2000) (citing *Weyant*, 101 F.3d at 856) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause

things, "no meaningful care exists" in the SCCF Medical Unit (Compl. at 11; Pl.'s Mem. at 3),

and SCCF personnel improperly refused to allow him to see his personal medical doctors and to

have the requested back surgeries (Compl. at 17). In support of the motion for judgment on the

pleadings, Plaintiff asserts that Defendants have not asserted any

> credible defense to Defendant's complete and total ignoring of
> Plaintiff's serious medical needs, and Plaintiff's repeated, completely
> fruitless attempts, well documented over two years of incarceration
> in S.C.C.F., to obtain treatment, for <u>several</u> serious medical
> conditions, and injuries, to correct the causes, as well as to manage
> symptoms.

Pl.'s Mem. at 3 (emphasis in original).[8]  In opposition, counsel for Defendants Chaundry, Geraci

and Prentiss argue that the motion should be denied because, among other reasons, Defendants

(1) "have interposed an answer denying the operative allegations of wrongdoing in paragraph IV

of the . . . complaint. . . .[,]" and (2) have "interposed several defenses to the claim."  Thus,

Defendants contend, "at this stage of the pleadings, genuine issues of fact remain and a motion

for judgment on the pleadings is inappropriate. . . ."  Def.'s Opp'n [DE 44] at 1.[9]

---

of the Fourteenth Amendment.")

[8]      Plaintiff also requests asserts that the Rule 12(c) motion should be treated as a motion for
summary judgment.  However, in light of the procedural context of this case, the Court, in its
discretion, declines to convert Plaintiff's motion for judgment on the pleadings to a motion for
summary judgment.  *See Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07-CV-596, 2008 WL
728896, at *2 (E.D.N.Y. Mar. 17, 2008) ("Federal courts have complete discretion . . . in
determining whether to convert the motion to one for summary judgment. . . ."); *see also Dowdy
v. Hercules*, No. 07 Civ. 2488, 2010 WL 169624, at *4 (E.D.N.Y. Jan. 15, 2010) ("in light of
plaintiff's incarceration, his *pro se* status, and the lack of any discovery, the Court declines to
convert defendants' motion"); *Perez v. Hawk*, 302 F. Supp. 2d 9, 16 (E.D.N.Y.2004) (refusing to
convert to summary judgment motion where plaintiff was pro se prisoner asserting Bivens claim
for inadequate medical care).

[9]      Defendants further argue that the motion should be dismissed for failure to comply with
my Individual Practice Rules because Plaintiff (1) apparently did not serve or file a notice of
motion and (2) the memorandum of law in support of the motion exceeds 25 pages.  In light of

## A.      Claims Pursuant To Section 1983

Section 1983 provides that:

> [e]very person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be subjected,
> any citizen of the United States . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured. . . .

42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege conduct attributable to a person acting under color of state law that deprived Plaintiff of a right secured by the Constitution of the United States. *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 353 (E.D.N.Y. 1999) (Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution") (citation omitted).[10]

---

the leniency typically awarded to submissions by *pro se* plaintiffs, this Court declines to deny the motion for judgment on the pleadings based upon such technical grounds. However, Plaintiff is cautioned that, going forward, he is required to comply with my Individual Practice Rules and the Local Civil Rules of the Eastern District of New York, except that he is excused from filing documents on ECF.

[10]      The Court notes that the only Defendants that have been served in this action are Suffolk County Department of Health, SCCF Medical Unit, Suffolk County Department of Health Commissioner Humayun Chaundry, SCCF Chief Administrator Vincent Geraci and Dr. Prentiss. As discussed further below, service has not been effected upon Defendants Nurse Practioner "Alice," Nurse Practioner "Jane Doe," Drug/Alcohol Counselor Eliana and Nurse "James Doe" LPN.

Ceparano claims that he received inadequate medical care while at SCCF. "It is well-established that a prison official's denial of access to medical care or interference with prescribed treatment may constitute the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Perez v. Hawk*, 302 F. Supp. 2d 9, 17 (E.D.N.Y. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Although "the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care[,] not every lapse in medical care is a constitutional wrong. Rather, 'a prison official violates the Eighth Amendment only when two requirements are met.'" *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 834 (1994)). Plaintiff must show that (1) the alleged deprivation of adequate medical care was "sufficiently serious," and (2) the charged official acted "with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 279-80 (citations omitted).

The first step of this analysis -- whether plaintiff has shown "the alleged deprivation of adequate medical care [was] 'sufficiently serious" -- is an objective test. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Salahuddin*, 467 F.3d at 279 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (additional citations omitted). Here the Court makes two inquiries: (1) whether the prisoner was actually deprived of adequate medical care, and (2) whether the inadequacy in medical care was sufficiently serious. *Salahuddin*, 467 F.3d at 279-80 (citations omitted). Regarding the first inquiry, the Supreme Court has made clear that "the prison official's duty is only to provide reasonable care." *Id*. at 279 (quoting *Farmer*, 511 U.S. at 844-47). "Thus, prison officials who

act reasonably [in response to an inmate-health risk] cannot be found liable under the [Eighth Amendment] . . . and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability." *Salahuddin*, 467 F.3d at 279-80 (quoting *Farmer*, 511 U.S. at 845, 847) (internal quotations omitted). In connection with the second inquiry -- whether the inadequacy in medical care was "sufficiently serious" -- the Court "examine[s] how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993) (holding that prisoners may complain about both current harm and "very likely" future harm)).

The second step of the analysis -- whether plaintiff has shown "the charged official [acted] with a sufficiently culpable state of mind -- is a subjective test. *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300) (reasoning that "some mental element must be attributed to the inflicting officer" before the harm inflicted can qualify as "punishment"). Here, the Court determines whether plaintiff has proven that the charged official acted with "deliberate indifference" to plaintiff's health. *Id.* The Second Circuit has defined "deliberate indifference" as:

> a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin*, 467 F.3d at 280 (citations omitted).

With this framework in mind, the Court turns to analyze Plaintiff's claims of deliberate indifference as to each Defendant.

### 1. *Plaintiff's Claims Against The Individual Defendants*

Regarding the individual Defendants, Ceparano claims that (1) Dr. "Igor" refused to allow the requested back surgeries, prescribed an insufficient amount of pain medication and refused to let Ceparano see the x-rays of his knees (Compl. at 13, 17, 26; Pl.'s Mem. at 32); (2) Dr. Prentiss provided an inadequate annual physical examination, including not performing blood tests or an eye exam (Compl. at 7, 35; Pl.'s Mem. at 32); (3) Nurse Practitioner "Alice" provided inadequate treatment on multiple occasions, including refusing to authorize the requested spinal surgery and to renew the pain medication, and refusing to allow Ceparano to see a doctor, despite that she was "unqualified " to treat him (Compl. at 8, 14, 23; Pl.'s Mem. at 30-31, 33); (4) Drug/Alcohol Counselor "Eliana" declined to meet with him without an appointment and did not provide adequate drug counseling (Compl. at 38-40); and (5) Nurse Practioner "Jane Doe" presided over his medical grievances (*id*.at 4) and refused to prescribe adequate pain medication (*id*. at 37).[11]  Additionally, Ceparano alleges that despite the seriousness of his conditions, particularly the degenerative disc disease, the conduct of the various SCCF officials constituted a "complete denial of treatment."  Pl.'s Mem. at 28.

Turning to the first prong of the test for analyzing Ceparano's inadequate  medical treatment claims -- whether the alleged deprivation of adequate medical care was "sufficiently serious" -- the Court finds that Ceparano has not shown either that he was actually deprived of medical care or that the medical care he received was inadequate.  As Ceparano himself states, he

---

[11]     Plaintiff does not assert any claims as against Defendant Nurse "James Doe" LPN.

"visited medical over dozen times between 9/17/07 and March 28. . . ." Pl.'s Mem. at 32.

During those visits, he was examined several times by Nurse Practitioner Alice, as well as by

Dr. Igor and Dr. Prentiss. In connection with such visits to the SCCF Medical Unit, Ceparano

was given a pillow to better support his back and neck; (2) a prescription for Vicodin for a period

of one week for his various pains; (3) a longer-term prescription for an anti-inflammatory

medicine also for his pains; (4) a list of back strengthening exercises; (5) weekly weight checks

for a period of six weeks; (6) nutrition counseling, (7) several follow-up visits at SCCF Medical

Unit, (8) multiple x-rays, and (9) several visits with the mental health nurse and a prescription for

anti-anxiety medicine which he stated helped him sleep. Ceparano has not shown that such

treatments were unreasonable. *See Estelle*, 429 U.S. at 107 ("[T]he question of whether ... [a]

diagnostic technique [ ] ... is indicated is a classic example of a matter for medical judgment. A

medical decision not to order ... like measures[ ] does not represent cruel and unusual

punishment."); *Demata v. New York State. Corr. Dep't of Health Servs*, No. 99-0066, 1999 WL

753142, at *3 (2d Cir. Sept. 17, 1999) (dismissing 1983 claims against doctor for failure to

provide medical treatment and finding that "strengthening exercises are in fact a form of medical

care"); *Barrett v. Goldstein*, No. 07 CV 2483, 2009 WL 1873647, at *3 (E.D.N.Y. Jun. 29, 2009)

( "a prisoner's disagreement with a prison nurse's medical judgment regarding when to conduct a

physical examination does not represent cruel and unusual punishment under the Eighth

Amendment"); *Cruz v. Lashway*, No. 9:06-CV-867, 2009 WL 1734549, at * (N.D.N.Y. Jun. 18,

2009) (dismissing 1983 claim arising from refusal to allow *pro se* prisoner plaintiff to read forms

before surgery on grounds that plaintiff failed to alleged injury resulting from such refusal);

*Kemp v. Wright*, 01 CV 562, 2005 WL 893571, at *5 (E.D.N.Y. Apr. 19, 2005) (decision to treat

inmate's condition with medical rather than surgical treatment was objectively reasonable where "some of the physicians who examined Kemp found that surgery was indicated, [and] others recommended further tests and medication"); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[A prisoner's] disagreements over ... diagnostic techniques (e.g., the need for X-rays) ... are not adequate grounds for a section 1983 claim."). Thus, even taking all of Ceparano's allegations as true, the claims nonetheless do not establish that the Individual Defendants' conduct transgressed the constitutional standard. *See Jones*, 557 F. Supp. 2d at 413 ("Initially the Court must determine whether the inmate was actually denied adequate care. . . . Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable'") (quoting *Salahuddin*, 467 F.3d at 280) (additional citations omitted).

Moreover, the Court finds that Ceparano's allegations do not reflect that he received inadequate medical treatment while at SCCF, but that he disagreed with the treatments he actually did receive. The heart of the Complaint, according to Ceparano, is that rather than the treatments described above, he should have instead received (1) at least two pillows; (2) a higher dosage of Vicodin for a longer duration; (3) a prescription for sleeping medication; (4) authorization to have lumbar fusion surgery, rather than being treated "conservatively" with exercises and an anti-inflammatory; (5) weekly weight checks for a longer period of time, and a special diet; (6) examinations by doctors, including specialists, rather than a nurse practitioner; (7) more comprehensive examinations, including MRIs and blood work; and (8) appointments with a psychiatrist rather than a mental health nurse. Under the law as applied in the Second

Circuit, it is well-settled that "mere disagreement over the proper treatment does not a create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *Barrett*, 2009 WL 1873647, at *3 ("mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment") (citation omitted). As the Second Circuit has stated:

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. . . . We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. . . .

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir.1986) (quoted in *Barrett*, 2009 WL 1873647, at *3-4) (internal quotations and citations omitted). Ceparano has not shown that he was actually deprived of medical care, or that the care that he received was not reasonable.[12]

Although unnecessary in light of my finding that Plaintiff has not satisfied the first prong of the analysis, I nonetheless briefly turn to the second factor of the medical treatment claim analysis -- whether, from a subjective viewpoint, the Individual Defendants acted with a sufficiently culpable sate of mind. This standard "is satisfied by a showing that the official acted with 'deliberate indifference' toward Plaintiff's health, a state of mind akin to criminal recklessness." *Jones*, 557 F. Supp. 2d at 414 (quoting *Wilson*, 501 U.S. at 298). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk

---

[12]     In light of this finding, the Court need not inquire as to the second prong of the objective analysis -- whether the inadequacy in medical care was sufficiently serious.

that serious inmate harm will result." *Jones*, 557 F. Supp. 2d at 414 (quoting *Salahuddin*, 467 F.3d at 280). Here, Plaintiff alleges that the SCCF Officials provided him with purportedly inadequate medical treatment for the purpose of saving money. For example, several times throughout the Complaint and the Memorandum of Law, Plaintiff refers to his theory that he was provided with treatments that were free, as opposed to treatments that cost money. Plaintiff also makes bald, conclusory statements such as that the SCCF knew "that denial of access to treatment could cause [him] permanent nerve damage and paralysis." Compl. at 29, 41. In light of the attention given by SCCF officials to Ceparano's medical needs, such allegations, without more, do not demonstrate that when the Individual Defendants treated Plaintiff, they were aware of a substantial risk to Plaintiff's health as a result of such treatment. *See Vaval v. Zenk*, No. 04-CV-4548, 2007 WL 778429, at *6 (E.D.N.Y. Mar. 13, 2007) (dismissing 1983 claims where plaintiff was seen by medical staff on at least seven occasions, on at least four of which he discussed his knee condition, "and on each of those occasions was prescribed pain-killers, given work and duty passes, or instructed on proper preventative measures to alleviate his pain" and so "it cannot be said that the defendants knew of and disregarded an excessive risk to Vaval's safety or otherwise acted with deliberate indifference to Vaval's medical needs"); *West v. Brickman* 07 Civ. 7260, 2009 WL 77866, at *5 (S.D.N.Y. Jan. 8, 2009) (dismissing 1983 claims where plaintiff failed "to allege that defendants knowingly disregarded an excessive risk to her health or safety"). Plaintiff has not sufficiently alleged that he incurred further harm as a result of the Individual Defendants' treatments. *See West*, 2009 WL 77866, at *4 ("Although plaintiff does allege that she suffered significant swelling and pain as a result of defendants' actions, she does not indicate how her medical needs presented a condition of urgency, that might produce death,

degeneration, or extreme pain. . . .") (internal quotations omitted). Based upon such findings, in combination with the Court's previous conclusion that Plaintiff has not shown that he received inadequate medical treatment, the Court finds that Plaintiff has not adequately pled that the Individual Defendants acted with a sufficiently culpable state of mind, nor can he on the facts asserted here.

In sum, Ceparano's contention that something more should have been done by SCCF Officials to treat his conditions does not constitute a sufficient basis for a deliberate indifference medical claim. *See Demata*, 1999 WL 753142, at *2-3 (affirming dismissal of 1983 claims where plaintiff disagreed with treatment decisions and failed to show that defendants' care was unreasonable); *Barrett*, 2009 WL 1873647, at *3 ("A 'prisoner's right is to medical care - not the type or scope of medical care which he personally desires.") (quoting *Untied States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 868 (2d Cir. 1979)). In light of this information, I find that, with respect to the Individual Defendants, Plaintiff has not shown entitlement to judgment on the pleadings, and I respectfully recommend to Judge Feuerstein that such motion be denied.

Moreover, having read Plaintiff's allegations as broadly as possible and construed the claims to state the strongest arguments they suggest, I find that Plaintiff has not alleged sufficient facts to state a plausible Section 1983 claim for inadequate medical treatment. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's 1983 claims as against Individual Defendants Dr. "Igor," Dr. Prentiss, Nurse Practitioner "Alice," Drug/Alcohol Counselor "Eliana" and Nurse Practicner "Jane Doe" be dismissed *sua sponte*.

Additionally, construing Plaintiff's claims broadly, the Court cannot ascertained any allegations, either in the Complaint or the Memorandum of Law, as against Defendant Nurse

"James Doe" LPN. Accordingly, the Court respectfully recommends that Plaintiff's claims against Defendant Nurse "James Doe" LPN be dismissed from this action *sua sponte*. *See Vaval*, 2007 WL 778429, at *5 (citing, *inter alia*, *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (granting motion to dismiss "where the complaint names a defendant in the caption but contains no allegations indicating exactly how the defendant violated the law or injured the plaintiff")).

### 2. *Plaintiff's Claims Against The Municipal Defendants*

Plaintiff also asserts Section 1983 claims against Defendants Suffolk County Department of Health and SCCF Medical Unit (the "Suffolk County Defendants"), which are both arms of the municipal entity, the County of Suffolk, and therefore lack the capacity to be sued as separate entities. *See Toomer v. County of Nassau*, No. 07-CV-1495, 2009 WL 1269946, at *1 n. 1 (E.D.N.Y. May 5, 2009) (citing *Caidor v. M & T Bank*, No. 05 Civ. 297, 2006 WL 839547, at *_ (N.D.N.Y. Mar. 27, 2006). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002). Accordingly, the Court will construe Plaintiff's Complaint as lodged against Suffolk County Department of Health and SCCF Medical Unit to be claims against the County of Suffolk. *See Toomer*, 2009 WL 1269946, at *1 n. 1.

In bringing Section 1983 claims against the Suffolk County Defendants -- construed as against Suffolk County -- Plaintiff seeks to hold the County liable for the actions of its municipal employees. Section 1983, however, does not provide a cause of action on the basis of *respondeat superior*. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978).

Rather, a section 1983 claim against a municipality such as the County of Suffolk will be recognized only where the alleged constitutional violation by municipal employees resulted from a government custom, policy, pattern or practice. *See Dean v. New York City Transit Auth.*, 297 F. Supp. 2d 549, 554 (E.D.N.Y. 2004); *Rumala v. New York City Transit Auth.*, No. 02 CV 3828, 2005 WL 2076596, at *9 (E.D.N.Y. Aug. 26, 2005) (municipal entity can be held liable only if the plaintiff "can prove that the violation was committed pursuant to a 'policy, statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officer'") (quoting *Monell*, 436 U.S. at 690) (additional citations omitted). Importantly,

> [t]he policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation ... So long as the discriminatory practices of city officials are persistent and widespread they could be so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability.

*Sorlucco v. New York Police Dep't*, 971 F.2d 864, 870-71 (2d Cir.1991). Here, the Court is unable to ascertain from the Complaint -- other than generalized assertions of lack of access to sufficient medical care as Plaintiff defines such sufficiency -- what policy, practice or custom, if any, Plaintiff is asserting or how such policy or practice is discriminatory.

Under Second Circuit precedent, Plaintiff bears the burden of establishing, as a matter of law, that the conduct of a given official represents an official policy. *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000). In the instant case, the closest Plaintiff comes to alleging a municipal policy or practice is set forth at the beginning of Section IV of the Complaint (Statement of Claim):

> Suffolk County Correctional Facility's Medical Unit is a fraud designed to perpetuate the illusion of providing care to satisfy legal requirements, but beyond emergency/first aid measures necessary to

27

stabilize an inmate until he leaves the facility, no meaningful care exists, arbitrary regulations designed to deny care and cost expenditure exist for everything, including the most insignificant of ailments.  For example, a 'prescription' is required for <u>salt</u> to gargle with, antacids, or Tylenol.  Nurses (LPN's) dispense medicine on housing units, but barely listen to complaints, referring you to filing a 'medical slip,' the way to access care, slips are often ignored. Complaints, even emergencies, [are] reported to C.O.'s, are ignored, and you are referred to the slip system.  Face to face communication to access medical care does not exist.  Slips only get you a nurse practioner.  Doctors are very rare.  Nurses run medical, as if they are doctors.  Evaluations, and any superficial testing (an x-ray) at most, are done 'in-house,' designed to dismiss concerns, and deny treatment.  They won't let you see your doctor, but they don't treat you themselves.  On rare occasions when an outside doctor is accessible, his orders are ignored and treatment undone.

Compl. at 11-12 (emphasis in original).

In other words, Plaintiff is alleging that at SCCF, inmates must submit written "slips" in order to be treated for medical conditions; patients are often treated by nurse practitioners rather than doctors; prescriptions are required for any type of medicine; and inmates are not permitted to be treated by their outside physicians, but rather, examinations, including procedures such as x-rays, are performed in SCCF.  Construing Plaintiff's claims as broadly as possible, Plaintiff appears to be alleging that SCCF's denial of his requests to allow him to be seen by his private physicians (at such doctors' offices) and refusal to authorize the requested back surgeries amount to a policy by Suffolk County to deny inmates their adequate medical care for the purpose (at least in part) of saving money.

Even in light of the relaxed standards applied to *pro se* complaints, the Court finds that the incidents described by Plaintiff do not constitute "municipal policy, practice or custom" consistent with *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See Dean*, 297 F. Supp. 2d at 557.  In the context of a Section 1983 claim, a plaintiff

"must make specific allegations of fact that indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple and conclusory statements are insufficient." *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992) (quoting *Laird v. Tatum*, 408 U.S. 1, 10 (1972)). Here, Plaintiff's claims against Suffolk County are, fundamentally, a disagreement with the decisions made by the medical staff as to how he should be treated -- *e.g.*, to treat his back condition with exercise rather than surgery, and to prescribe Flexeril rather than Vicodin. As discussed above, "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire[,]" (*Jones*, 557 F. Supp. 2d at 413) and "mere differences of opinion between the prisoner and the defendant concerning the proper course of treatment do not constitute a violation of a prisoner's constitutional rights." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Plaintiff's claims of inadequate medical treatment are belied by the fact Plaintiff was seen by officials in the SCCF on several occasions and that he was treated for his various conditions, albeit not in the manner he would have preferred. Accordingly, the Court concludes that Plaintiff has not shown that there exists any custom or policy by Suffolk County to promote the goal of cost cutting at the expense of providing reasonable medical care to inmates.

After a careful review of the pleadings, the parties' submissions and the applicable case law, I find that Plaintiff has failed to sufficiently allege that Defendants' purported conduct resulted from any custom, policy, pattern or practice by Suffolk County which violated Plaintiff's rights. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's 1983 claims against Suffolk County Department of Health and SCCF Medical Unit, construed as against Suffolk County, be dismissed.

### 3. Plaintiff's Claims Against Chaundry and Geraci

Plaintiff designates Defendants Chaundry and Geraci as "Comm. Dept of Health" and "SCCF Chief Adm.," respectively. Compl. at 9. Moreover, the Complaint does not contain any allegation that either Chaundry or Geraci acted beyond the scope of their employment. For these reasons, the Court construes Plaintiff's claims to be against Chaundry and Geraci in their official capacities as employees of Suffolk County only. *See Toomer*, 2009 WL 1269946, at *1, n.1.

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). In the recent decision *Iqbal v. Ashcroft*, _ U.S. _, 129 S.Ct. 1937, 1948 (2009), the Supreme Court clarified that liability may be imposed on a supervisor through Section 1983 only "if that supervisor actively had a hand in the alleged constitutional violation." *Bellamy v. Mount Vernon Hospital*, 07 CV 1801, 2009 U.S. Dist. LEXIS 54141, at *27 (S.D.N.Y. June 26, 2009) . Specifically, "a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred." *Id*. at *27-28; *see also Iqbal*, _ U.S. _, 129 S.Ct. at 1948 ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution").

Although Chaundry and Geraci are named as Defendants, the Court is unable to ascertain what actions, if any, either took against Plaintiff. *See Dozier v. Sgt. C.O. Chapman*, Civ. No. 9:05-CV-127, 2009 WL 3055271, at *8 (N.D.N.Y. Sept. 1, 2009) (dismissing claims against supervisory officer for failure to state a claim where plaintiff made no allegation of that officer's personal involvement). In light of the fact that Plaintiff has not made a single allegation naming

Chaundry or Geraci specifically, the Court concludes that Plaintiff has not established that either

Defendant was personally involved in the purported misconduct at SCCF or created or

contributed to a policy or custom of unconstitutional practices. *See Bellamy*, 2009 U.S. Dist.

LEXIS 54141, at *28. Moreover, Plaintiff has not alleged that either Chaundry or Gearci was

aware of Plaintiff's medical ailments or of his requests for treatment and SCCF's denials of such

requests. *Id*. at *28-29 (citing *Reid v. Artus*, 984 F. Supp. 191, 195 (S.D.N.Y. 1997) (dismissing

asthmatic prisoner's Section 1983 claim against a supervisory official when the pleadings

"fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably

conclude personal involvement by the supervisory official defendant . . . that [defendant] created

or continued a policy or custom which allowed the violation to occur, or that [defendant] was

grossly negligent in managing the subordinates who caused the unlawful condition").

Furthermore, Plaintiff offers no evidence that Chaundry or Geraci demonstrated deliberate

indifference to Plaintiff's medical needs -- indeed, Plaintiff has not even suggested that they were

involved in the alleged denials of treatment. *Bellamy*, 2009 U.S. Dist. LEXIS 54141, at *29.

Accordingly, Plaintiff has failed to state a claim against Chaundry or Geraci.

In light of the Court's findings set forth above, I respectfully recommend to Judge

Feuerstein that Plaintiff's 1983 claims against Defendants Chaundry and Geraci, sued here in

their official capacities, be dismissed.

### 4. *Plaintiff's ADA Claims*

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., is applicable to

inmates in state correctional facilities. *See Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y.

2005). To state a claim under the ADA, a plaintiff must plead: (1) that he is a qualified

individual with a disability; (2) that the defendants are subject to the ADA; and (3) that he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of his disability. *Alexander v. Galeno*, No. 07 Civ. 9662, 2009 WL 3754254, at *5 (S.D.N.Y. Nov. 5, 2009) (citations omitted). The ADA provides "disabled individuals redress for discrimination by a public entity [, and] [t]hat term, as defined in the statute, does not include individuals." *Lyman v. City of New York*, No. 01 Civ. 3789, 2003 WL 22171518, at *10 (S.D.N.Y. Sept. 19, 2003) (citations omitted). Thus, ADA claims may only be brought against state officials acting in their official capacity. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

In light of Plaintiff's allegations in both the Complaint and the Memorandum of Law that he is disabled, the Court will, for purposes of this analysis, assume that Plaintiff has pleaded that he is a qualified individual under the ADA, and will also assume that Defendants, acting in their official capacities, are subject to the ADA. Even with these assumptions, Plaintiff fails to allege that he was denied treatment for his various conditions because of any "unlawful discriminatory conduct" relating to any disability. *Alexander*, 2009 WL 3754254, at *5 (citing *Maccharulo v. Gould*, 643 F. Supp. 2d 587, 602 (S.D.N.Y. 2009)). As discussed above, Plaintiff acknowledges that he was seen by doctors and nurses in the SCCF Medical Unit on numerous occasions. His complaints center around his dissatisfaction with the choice and supposed ineffectiveness of the medical treatment he received. *See Alexander*, 2009 WL 3754254, at *5; *see also Singleton v. Perilli,* No. 03 Civ. 2271, 2004 U.S. Dist. LEXIS 501, at *1112 (S.D.N.Y. Jan. 15, 2004) (prisoner plaintiff fails "to allege anywhere in complaint that he was denied access to a service, program, or activity because of his disabled status."); *Rosado v. Alameida*, No. 03CV1110J,

2005 WL 892120, at *2 (S.D. Cal. Feb. 8, 2005) ("The ADA does not create a federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities. . . . The benefits and services Plaintiff wishes to receive are for his disability; it is illogical to say that he is being denied medical services because he has a disability.") (citation omitted)).

Reading Plaintiff's claims under the ADA liberally, the Court finds that Plaintiff has not pleaded that he was denied the opportunity to participate in or benefit from any services, programs, or activities at SCCF, or was otherwise discriminated against by the Defendants, by reason of his various medical conditions, and thus, Plaintiff is not entitled to judgment on the pleadings on that claim. Moreover, Plaintiff has not alleged sufficient facts to state a plausible claim for relief under the ADA. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's claims under the ADA be denied *sua sponte*.

### 5.        *Plaintiff's Retaliation Claims*

Construing the claims broadly, Plaintiff asserts that (1) in retaliation for numerous requests during visits to the Medical Unit, Nurse Practitioner Alice never wrote the extra blanket' order; (2) in retaliation for repeated requests to transfer out of the medical tier, unnamed SCCF officials moved him to a prison tier full of gang members where a fight broke out within 24 hours of his arrival; and (3) in retaliation for submission of numerous medical slips, as of September 7, 2008, the SCCF medical unit no longer responded to his requests.

Courts within the Second Circuit approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489,

491 (2d Cir.2001) (citations omitted). In order to prevail on a retaliation claim, a plaintiff bears

the burden to prove that (1) he engaged in constitutionally protected conduct, and (2) the conduct

was a substantial or motivating factor for the adverse actions taken by prison officials. *Bennett v.*

*Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted). There must be a "causal connection

between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d

Cir. 2004) (citation omitted). "A plaintiff may meet the burden of proving an inappropriate

retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal

proximity, thus obviating the need for direct evidence." *Cruz*, 2009 WL 1734549, at *12 (citing

*Bennett*, 343 F.3d at 138-39.

Other factors from which an improper or retaliatory motive may be inferred include the

inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by

the defendant regarding his motive for disciplining plaintiff. *Cruz*, 2009 WL 1734549, at *12

(citing, *inter alia*, *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir.1995)). "Moreover, in the

prison context [the Second Circuit has] previously defined adverse action objectively, as

retaliatory conduct that would deter a similarly situated individual of ordinary firmness from

exercising . . . constitutional rights." *Cruz*, 2009 WL 1734549, at *12 (quoting *Gill*, 389 F.3d at

381 (internal quotations and additional citation omitted). "This objective test will apply even

though a particular plaintiff was not himself deterred." *Id*.

Here, Plaintiff claims that the adverse actions taken against him were the alleged

deprivations of medical care by the various Defendants and his transfer to a dangerous prison

tier. The Court assumes, for purposes of this analysis, that in requesting medical treatment,

Plaintiff was engaged in constitutionally protected conduct. However, Plaintiff has not shown

that his conduct was a substantial or motivating factor for the adverse actions allegedly taken by SCCF officials. In light of the Court's earlier finding that Plaintiff has failed to state a claim under the Eighth Amendment -- and that, based upon the allegations set forth in the Complaint, the Court cannot find that Plaintiff did not receive medical treatment -- the Court also finds that Plaintiff has failed to establish that any of the Defendants took adverse actions against him that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *See Cruz*, 2009 WL 1734549, at *13.

## B.     Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

While a plaintiff is required under the PLRA to exhaust every administrative remedy available to him prior to filing suit, the Supreme Court has held that failure to exhaust under the PLRA is an "affirmative defense the defendant must plead and prove." *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007). In the instant case, Defendants, in their Answer, did not raise an affirmative defense of failure to exhaust administrative remedies. *See* DE 15. Accordingly, this Court makes no finding as to whether, in connection with his present claims, Plaintiff exhausted the administrative remedies available to him at SCCF.

35

## V.    PLAINTIFF'S MOTION TO AMEND

Ceparano seeks leave to amend the caption of the case to change (1) Dr. "Igor" to Dr.

Roginsky, and (2) Nurse Practitioner "Jane Doe" to Nurse Practitioner "Pat."  *See* DE 53.

Ceparano also seeks leave to add Nurse Practitioner "Amy."  Finally, Plaintiff states requests that

Defendants "fully identify the names of the remaining Defendants."  *Id*.

Generally, "when addressing a *pro se* complaint, a district court should not dismiss

without granting leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated."  *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir.

2002).  Although the usual practice upon granting a motion to dismiss is to allow leave to

replead, a court may dismiss without leave to amend when amendment would be futile (*Ellis v.

Chao*, 336 F.3d 114, 127 (2d Cir. 2003)), or when the "substance of the claim pleaded is

frivolous on its face."  *Bloom v. United States Gov't*, 02 Civ. 2352, 2003 WL 22327163, at *8

(S.D.N.Y. Oct. 10, 2003) (quoting *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1998)).  A

claim is frivolous when it is vague and incomprehensible, or when it is supported by baseless

factual allegations "describing fantastic or delusional scenarios."  *Bloom*, 2003 WL 22327163, at

*8 (citations omitted).

Having carefully considered the Complaint, the Answer, Plaintiff's Motion for Judgment

on the Pleadings, and Defendants' opposition to such motion, I find that granting leave to replead

would be futile in light of the grounds upon which I am recommending denial of the Motion for

Judgment on the Pleadings and *sua sponte* dismissal of all of Plaintiff's claims.  In light of the

medical attention given to Plaintiff while he was at SCCF, as ascertained from Plaintiff's own

submissions, the Court finds it unlikely that Plaintiff could amend the pleadings to state a

plausible claim for violation of his Eighth Amendment rights as to the Individual Defendants. With respect to the Municipal Defendants -- Suffolk County, Chaundry and Geraci -- Plaintiff has not shown that the incidents described in the Complaint amount to "government custom or policy" that rises to the level of a viable claim against a municipality or municipal employees acting in their official capacity. Moreover, Plaintiff has not shown any personal involvement by Chaundry or Geraci, or that either engaged in conduct rising to the level of a constitutional violation. Regarding Plaintiff's ADA claims, in light of the absence of allegations by Plaintiff that he was denied the opportunity to participate in or benefit from any services, programs, or activities at SCCF, or was otherwise discriminated against as a result of his disability, it is unlikely that, upon repleading, Plaintiff could satisfy the pleading requirements of the ADA. Finally, in connection with Plaintiff's retaliation claims, given this Court's conclusion that Plaintiff has not shown that he did not receive reasonable medical care while at SCCF, the Court does not see how Plaintiff could amend the pleadings to state a plausible claim for retaliation arising from his medical treatment.

After careful consideration of this issue, the Court concludes that it is unlikely that Plaintiff will be able to correct the pleading defects identified herein. Accordingly, I respectfully recommend that Plaintiff's request for leave to replead be DENIED.

## VI.   PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Plaintiff moves for entry of a default pursuant to Rule 55(a) against all Defendants for failure to file an Answer within 20 days after being served with the Summons and Complaint, in violation of Rule 12(a)(1)(A)(i). *See* DE 27 at 2, 3; DE 37.[13] Plaintiff contends that the Suffolk

---

[13]     Although Plaintiff designates his motion as one for "default judgment," it is actually a motion for "default" pursuant to Rule 55(a). *See Pinaud v. County of Suffolk*, 52 F.3d 1139,

County Attorney was served, on behalf of all Defendants, on March 19, 2009, thereby making April 8, 2009 the deadline for Defendants to file their respective responsive pleadings. *Id.* In support of his motion, Plaintiff submitted the "Process Receipt and Return" form which shows that such service was achieved on March 19, 2009. *See* DE 29, 30. The Answer filed by Commissioner Chaudry, Dr. Geraci and Dr. Prentiss is dated April 9, 2009 and was postmarked April 11, 2009. *See* DE 27 at 2-3; *see also* DE 29, 30. According to Plaintiff, the Answer was deemed served on April 11, thereby making it three days late. DE 27 at 3. Moreover, Plaintiff asserts, Defendants have not shown "good cause for failure to comply with Federal Rules of Civil Procedure in their 'Answer to Complaint,' nor can they, for their inexcusable failure to reply before the deadline expired." *Id.* at 3.

In opposition, counsel for Defendants Commissioner Chaudry, Dr. Geraci and Dr. Prentiss assert that, although the County Attorney was, in fact, served on March 19, 2009, the County Attorney is not a party to this action and, in any event, service upon the County Attorney does not constitute service upon these three Defendants. *See* DE 28 at 1. Defendants Chaundry, Geraci and Prentiss were not served until March 25, 2009 and accordingly, their answer, which was filed on April 9, 2009, was interposed in a timely fashion. *Id.*

The Court's review of the electronic docket in this action indicates that on March 5, 2009, summonses were issued as to "Drug/Alcohol Counselor Eliana, Suffolk Co. Dept of Health, S.C.C.F. Medical Unit, Dept. of Health Comm. Humayun Chaundry, S.C.C.F. Chief ADM Vincent Geraci, Doctor 'Igor,' Dr. Prentiss, Nurse Practitioner Alice [and] Warden S.C.C.F." *See* Mar. 5, 2009 Elec. Order. The necessary documents were forwarded to the U.S. Marshals

---

1152 n.11 (2d Cir. 1995).

Service for service on these parties. *See* Mar. 5, 2009 Elec. Order. On two separate occasions, Plaintiff was informed that "service cannot be made to 'James and Jane Doe' defendants" and in order to effectuate such service, Plaintiff "would need to provide the Court with identifying information, such as a badge number." *See* DE 11, 14.

The docket further reveals that Defendants Suffolk County Department of Health, Dr. Prentiss, Dr. Geraci, Commissioner Chaundry and the S.C.C.F. Medical Unit were each served on March 25, 2009, and their answers were due on April 14, 2009. The executed summonses for these Defendants were returned to Plaintiff and were filed on ECF on April 7, 2009. *See* DE 16, 19, 21, 22. 23. In addition, the Suffolk County Attorney and the SCCF Warden were served on March 19, 2009 and March 25, 2009, respectively. Certificates of service were returned to Plaintiff and were filed on ECF on April 7, 2009. *See* DE 24, 25. Based upon this review, the Court concludes that the Answer of Defendants Chaundry, Prentiss and Geraci were due on April 14, 2009, and were therefore served in a timely fashion. Accordingly, a default cannot be entered against these Defendants Chaundry, Prentiss and Geraci.

Regarding Defendants Suffolk County Department of Health and S.C.C.F. Medical Unit, under the circumstances presented and in light of the Court's previous finding that such Defendants lack the capacity to be sued as separate entities, the Court declines to enter a default against them.

With respect to the remainder of the Defendants named in the Complaint -- Drug/Alcohol Counselor "Eliana," Nurse Practitioner "Alice," Dr. "Igor," Nurse Practioner "Jane Doe" and Nurse "James Doe" LPN -- service was not effected upon these Defendants via service upon the Suffolk County Attorney. The docket shows that these individuals were not actually served in

39

this action.  The respective summonses were returned to Plaintiff unexecuted, and Plaintiff was informed that further identifying information, including the individuals' last names, was needed to effect service.  *See* DE 17, 18, 20.  Thus service was not effected upon any of these Defendants, and so a default cannot be entered against them.

In light of the findings set forth above, I respectfully recommend to Judge Feuerstein that Plaintiff's Motion for Default be denied.

## VIII.  PLAINTIFF'S MOTION TO COMPEL

In the Motion to Compel [DE 12], Plaintiff requests that the Court issue orders requiring SCCF (1) to allow Plaintiff "access to the law library <u>daily</u>, with the exception of when groups of females or 'Box' (S.H.U.) inmates are there" (DE 12 at 3), and (2) to bring Plaintiff to his doctor to facilitate the requested lumbar fusion surgery, which Plaintiff claims is necessary to prevent paralysis (*id.* at 6).[14]  Although Plaintiff captioned his motion a "Motion to Compel," it is actually a motion for injunctive relief, as it seeks prospective relief in the form of Court orders mandating that the prison take certain actions.

Plaintiff's Motion to Compel must be denied for several reasons.  First, SCCF is not named as a defendant in this action.  Thus, even if Plaintiff had stated a viable basis for

_____

[14]     Plaintiff also requests that the Court (1) order SCCF to release the hold on his prison account funds, and (2) serve Plaintiff's papers on Defendants until his account funds are released. DE 12 at 4-5.  In reviewing the docket, the Court notes that subsequent to Plaintiff's filing of the instant motion, funds have been released from his account to the Court for expenses related to this litigation.  *See* DE 26, 32, 36, 51  Moreover, pursuant to Judge Feuerstein's July 9, 2009 Order [DE 52], Plaintiff's account was refunded $40 because Plaintiff overpaid the filing fees on two litigations by $ 20 each.  In addition, it appears that with respect to the motions at issue here, Plaintiff was able to serve copies on Defendants.  Accordingly, the Court concludes that these issues have been resolved and the Court need not address them further.

injunctive relief, the Court could not grant the requested relief because it has no jurisdiction over SCCF here.

Second, a prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility. *See Thompson v. J. Carter*, 284 F. 3d 411, 415 (2d Cir. 2002) (citing *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (*per curiam*)); *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). The rationale behind this rule is that "an actual controversy must be extant at all stages of the case, not just at the time the complaint is filed." *Thompson*, 284 F. 3d at 415 (quoting *Beyah v Coughlin*, 789 F.2d 986, 988 (2d Cir. 1986)). Here, Plaintiff was incarcerated at SCCF when he filed the instant motion, but was subsequently transferred to another facility. Because Plaintiff is no longer housed at SCCF, there is no live controversy as to the sufficiency of his access to the SCCF law library or the decisions by SCCF officials regarding his medical care.

Third, Plaintiff's motion as it pertains to his access to the law library must be denied because Plaintiff has not shown that his constitutional right to meaningful access to the courts has been violated as a result of the alleged insufficient access to the SCCF library. While prisoners enjoy a constitutional right of meaningful access to the courts (*Bounds v. Smith*, 430 U.S. 817, 821 (1977) ("it is now established beyond doubt that prisoners have a constitutional right of access to the courts")), that access need only be reasonable. *Brown v. Williams*, No. 95 CV 3872, 1998 WL 841638, at *3 (E.D.N.Y. Dec. 2, 1998) (citing *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("Constitution does not mandate use of any particular method for providing access to

courts")). Prisoners "do not have a 'freestanding' right to libraries or legal assistance, but only a right to the 'tools' that would afford them 'a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *West v. Breslin*, 00-CV-6660, 2001 U.S. Dist. LEXIS 25452, at *12 (E.D.N.Y. Aug. 21, 2001) (citing *Lewis v. Casey*, 518 U.S. at 356-57). "The Constitution does not guarantee inmates the means to file all manner of claims or to litigate effectively claims that have been filed; rather, inmates have a constitutional right only to the resources necessary for them to present their grievances to the courts in order to attack their sentences or conditions of confinement." *Lewis*, 518 U.S. at 354-55 (citing cases).

"[T]o allege a violation of the constitutional right of meaningful access to the courts, a plaintiff must show that he has suffered 'actual injury' as a result of the denial of that right." *West*, 2001 U.S. Dist. LEXIS 25452, at *14 (quoting *Lewis*, 518 U.S. at 349-50). A prisoner cannot establish actual injury "simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Graham v. Perez*, 121 F. Supp. 2d 317, 324 (S.D.N.Y. 2000) (quoting *Lewis*, 518 U.S. at 351).

Rather, a prisoner must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id*.; *see also Brown*, 1998 WL 841638, at *5 (dismissing plaintiff's complaint because defendant's actions neither deprived plaintiff of "the ability to present his case in a meaningful fashion" nor prejudiced or caused the denial of a legal claim); *Shepherd v. Fraisher*, 96 Civ. 3283, 1999 WL 713839, at *5 (S.D.N.Y. Sept. 14, 1997) (plaintiff must allege "some actual prejudice or denial of a legal claim" when claiming denial of access to the courts); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y.

1994) ( "[W]here an inmate alleges a denial of access on some other claim, *i.e.*, that the actions of an individual prevented him from accessing the law library or meeting a court deadline, then the court must determine whether the prisoner has suffered an actual injury in a pending suit.").

In the instant case, Plaintiff alleges that while at SCCF, he was permitted to go to the law library "on average, once every 10 to 12 days, for approximately 45 minutes." DE 12 at 2. Plaintiff maintains that this is an inadequate amount of time to provide access to the courts, and that this problem was "compounded exponentially by a combination of a jail overcrowded to near double its capacity, while equipment failures (computer, printer, copier) often render our time there useless." *Id*. Having reviewed Plaintiff's assertions, the Court concludes that while at SCCF, Plaintiff had sufficient access to legal materials, despite that he may have been allowed less time in the library than he would have preferred. *See Graham*, 121 F. Supp. 2d at 324. In light of the number of motions Plaintiff has filed in this action, all of which contain extensive citation to case law, there is no basis to find that Plaintiff's legal claims were prejudiced or that his access to the Court was impeded due to his purportedly limited access to the library.

For these reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's Motion to Compel be denied.

## IX. CONCLUSION

In light of the analysis set forth above, I respectfully make the following recommendations to Judge Feuerstein:

1.      that Plaintiff's motions to compel [DE 12] be denied;

2.      that Plaintiff's motion for entry of default [DE 27] be denied;

3.      that Plaintiff's Motion for Judgment on the Pleadings [DE 44] be denied; and

4.      that Plaintiff's motion to amend [DE 53] be denied.

I further respectfully to Judge Feuerstein that Plaintiff's Complaint be dismissed in the entirety with prejudice *sua sponte*.

****

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) and (e).  Such objections shall be filed with the Clerk of the Court via ECF, **except in the case of a party proceeding *pro se*.  *Pro Se* Plaintiff Anthony Ceparano must file his objections in writing with the Clerk of the Court within the prescribed time period noted above.  A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Sandra J. Feuerstein, and to my Chambers as well.  Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of those objections for purposes of appeal.**  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir.), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Counsel for Defendants is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiffs *Pro Se* by overnight mail and first class mail.  Defendants' counsel is further directed to file proof of service on ECF.

**SO ORDERED.**

Dated: Central Islip, New York
        March 25, 2010

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge